**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

CASE NO.: _____

MON ETHOS PRO CONSULTING, LLC, a
Massachusetts limited liability company; and
DAVID WHITAKER, an individual;

      Plaintiffs,

vs.

PLANE TRAVEL, LLC, a Florida limited
liability company; L AND P AIR LLC, a
Delaware limited liability company; LESLIE D.
GORDEN, an individual;

      Defendants.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs Mon Ethos Pro Consulting, LLC and David Whitaker, by and through their undersigned counsel, sue Defendants Plane Travel, LLC, L and P Air LLC, and Leslie D. Gorden, and allege as follows:

**INTRODUCTION**

1. This lawsuit arises from a charter flight performed by Defendants on June 4, 2020, and paid for by Plaintiff David Whitaker of Plaintiff Mon Ethos Pro Consulting, LLC.

2. Prior to booking the flight, Mr. Whitaker talked with his broker about booking a direct flight from St. Thomas, U.S. Virgin Islands, to New Hampshire. Mr. Whitaker originally planned to have five passengers and three dogs in his party but reduced his group to three passengers and three dogs, in order to reduce weight and improve the chances of a direct flight to his destination. Mr. Whitaker was told no other flights were available other than the flight offered by Defendants. The flight was booked for Plaintiffs Mon Ethos Pro Consulting, LLC, and its

1

owner, David Whitaker, to transport Mr. Whitaker non-stop from the U.S. Virgin Islands ("USVI") direct to New Hampshire for a time-sensitive business meeting on behalf of Mon Ethos, all of which was communicated to Defendants prior to departure (the "Flight").

3. Defendant Leslie D. Gorden was the captain of the Flight. The aircraft is owned by Defendant L and P Air LLC, an entity that on information and belief is owned by Defendant Gorden. The Flight was offered by the Part 135 charter certificate holder Plane Travel, LLC.

4. Defendants falsely promised Mr. Whitaker that he would arrive in New Hampshire on time by flying direct from Saint Thomas, USVI, to New Hampshire without making any stops. Mr. Whitaker had already reduced the total weight of his party by leaving two passengers behind in the USVI in order to make a direct flight possible.

5. Mr. Whitaker informed Defendants that if they caused the aircraft to depart from USVI without first clearing customs, he would consider it an act of kidnapping.

6. Instead of going directly to New Hampshire as promised, the Flight departed directly to Fort Lauderdale, Florida, against Mr. Whitaker's instructions and without his approval, holding him hostage in his own-chartered aircraft. Because the airplane's internet was not working, Mr. Whitaker could not communicate with anyone on the ground to intervene and assist with the Flight or notify the other participants in the business meeting of his delayed arrival.

7. Contrary to many promises and assurances to Mr. Whitaker, the aircraft crew failed to clear customs before departure from Saint Thomas, requiring Mr. Whitaker to deplane in Florida where he and his party waited for hours and were questioned at length by authorities. During this delay on the ground, the aircraft crew removed Mr. Whitaker's expensive medical sleep device from the airplane and lost it, leaving it behind in Florida.

8. Adding more insult to injury, the aircraft's climate system was in disrepair, sending the cabin temperature soaring to nearly 100 degrees Fahrenheit, which Mr. Whitaker, his party, and his dogs were forced to endure for hours. Defendants failed to provide sufficient water to cope with the extreme heat creating further stress.

9. Many of the promised in-flight amenities were not provided, leaving Mr. Whitaker unable to contact anyone on the ground to alert them to the delays caused by Defendants and preventing him from rescheduling the business meeting.

10. When the Flight finally touched down in New Hampshire, close to midnight and hours behind schedule, Mr. Whitaker had missed the business meeting, and Mon Ethos lost an anticipated multi-million dollar contract with a National Basketball Association star.

11. This lawsuit seeks to recoup Plaintiffs' losses and hold Defendants accountable for their false statements, broken promises, negligent operation, and interference with Mon Ethos' business.

**PARTIES**

12. Plaintiff Mon Ethos Pro Consulting, LLC, is a Massachusetts limited liability company with its principal place of business in Massachusetts. Mon Ethos combines executive level talent management with cutting-edge business development tools to help athletes, artists, and executives generate greater revenue and interest in their content and services.

13. Plaintiff David Whitaker is an individual domiciled in Massachusetts who is Mon Ethos' founder, president, and owner.

14. On information and belief, Defendant Plane Travel, LLC, is a Florida limited liability company with its principal place of business in Pompano Beach, Florida. Plane Travel, LLC holds itself out to the public as an operator of private jet charters as well as commercial and

6801253v.1

cargo aviation services. Plane Travel, LLC conducts business internationally and throughout the United States, including in this district.

15. On information and belief, Defendant L and P Air LLC is a Delaware limited liability company with its principal place of business in Missouri. L and P Air LLC holds itself out to the public as a provider of private jet and commercial aviation services. L and P Air LLC conducts business internationally and throughout the United States, including in this district.

16. On information and belief, L and P Air LLC is the owner of N479DR, a 1993 Beechjet 400A twin-turbine aircraft which is offered to Plane Travel, LLC's charter jet customers in interstate commerce. Photos of the aircraft with the N479DR registration number visible appear on Plane Travel, LLC's website, including as of the date of the filing of this Complaint.

17. On information and belief, L and P Air LLC and Plane Travel, LLC have a contractual relationship concerning the use of N479DR by Plane Travel, LLC's charter jet customers.

18. L and P Air LLC also provides the services of its member-manager, Leslie D. Gorden, as captain and pilot-in-command of N479DR.

19. On information and belief, Plane Travel, LLC, and L and P Air LLC share operational control of all revenue flights utilizing N479DR in the service of Plane Travel, LLC's charter jet customers.

20. On information and belief, Defendant Leslie D. Gorden is an individual domiciled in Missouri. Mr. Gorden is an experienced, ATP-rated pilot with thirteen type ratings, including the Beechjet 400A. According to publicly available FAA records, Mr. Gorden also holds a flight instructor certificate and an airframe-and-powerplant certificate. On information and belief, Mr. Gorden is exceedingly familiar with the capabilities and limitations of the Beechjet 400A,

including its range and performance. Indeed, Mr. Gorden is required by law to have and maintain a high degree of familiarity with any type of aircraft he is entrusted to safely and legally operate as pilot-in-command.

21. Mr. Gorden personally and on behalf of Defendants, as L and P Air's owner and as Plane Travel's chief pilot, made false and misleading statements and promises to Plaintiffs and was in direct control as pilot-in-command of the conduct of the flight.

## JURISDICTION AND VENUE

22. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a) because there is diversity between the parties and the amount in controversy exceeds $75,000.00. This Court also has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

23. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) and (3) because Plane Travel, LLC is a Pompano Beach-based company that formed a contract with Plaintiffs for the performance of a charter flight from the U.S. Virgin Islands to New Hampshire, because L and P Air regularly conduct business in this district via the operation of N479DR from Fort Lauderdale, because Defendants caused the aircraft to make a stop in this district in the course of the flight, and because Defendant Gorden regularly transacts business in this district as chief pilot of Plane Travel, LLC.

## FACTS

24. In late May and early June, Mr. Whitaker sought transportation from Saint Thomas, U.S. Virgin Islands, to New Hampshire for five passengers and three dogs. The same passengers and dogs have flown with him previously on flights procured for him through the same broker, and their information for the purposes of customs clearance was available to Defendants.

25. Mr. Whitaker and Mon Ethos were offered the use of N479DR, a 1993 Beechjet 400A provided by Defendant Plane Travel, LLC, owned by Defendant L and P Air LLC, and flown by Defendant Leslie D. Gorden, who also on information and belief serves as Plane Travel, LLC's Chief Pilot.

26. There are numerous variants and derivatives of Beechjet 400A aircraft, with different performance characteristics, carrying capacity, and range. Plaintiffs relied on Defendants' expertise to accurately convey information about the performance of N479DR.

27. Mr. Whitaker and Mon Ethos accepted the offer of N479DR on Wednesday, June 3, 2020, and completed payment before the Flight on Thursday, June 4, 2020. Mr. Whitaker, in order to facilitate a direct flight between Saint Thomas and New Hampshire with no intermediary stops, revised his plans to include three passengers (two fewer than originally planned).

28. Defendants confirmed to Plaintiffs multiple times that a direct flight to New Hampshire could be accomplished with N479DR.

29. Plaintiffs informed Defendants that one of the purposes for the flight was to travel for business on behalf of Mon Ethos, and that an important Zoom conference call was scheduled to take place in one of the arrival airport's conference rooms shortly after arrival. The Zoom conference call concerned a potential business deal with the agent of a prominent NBA player which Mon Ethos reasonably believed would result in at least $2,000,000 in income. Defendants assured Plaintiffs this timing was not a problem. Plaintiffs relied on Defendants' experience and expertise in assuring Plaintiffs that this timeline could be followed.

### I.     *Arrival at the Departure Airport*

30.    Mr. Whitaker and his party arrived at the airport in Saint Thomas on June 4 at approximately 3:15 P.M. AST.  They were introduced to the Captain, Defendant Gordon, and the first officer, whose name is unknown.

31.    One of the flight crew informed Mr. Whitaker's party that he had failed to pay his phone bill and could not make any calls to customs, his company, the FAA, weather briefers, or anyone else.  He blamed his wife for the claimed oversight.  Mr. Whitaker was surprised that a professional pilot could overlook making sure he had a working telephone prior to attempting an international flight.

32.    The flight crew also claimed there was a problem with one of the passengers' identification, even though all identifying information was already made available to Defendants in advance and the passenger had previously flown with Mr. Whitaker via the same broker who procured the Flight from Defendants.

33.    Mr. Whitaker provided this passenger's birth certificate, learner's permit, and credit card as additional verification as requested by Defendant Gorden and the flight crew.

34.    Shortly after arriving at the airport, Mr. Whitaker confirmed the timeline with the flight crew, who assured him that their estimated time of arrival in New Hampshire was between 8:00 and 8:30 P.M., local time.  Mr. Whitaker reminded the flight crew, including Defendant Gorden, that the flight needed to be made non-stop in order to arrive on time for his Zoom-call business meeting at 9:15 P.M. to 9:30 P.M., when he anticipated closing a deal on behalf of Mon Ethos for $2,000,000, with the business manager of a prominent NBA athlete.

35.    Defendants failed to inform Mr. Whitaker if they believed this timeline was not possible, which would have given him time to reschedule the important business meeting.  Instead

they assured him the timeline would be followed and the Flight would arrive on time in order to get Mr. Whitaker to pay for the errant flight.

36. Defendants likewise assured Mr. Whitaker that he and his party would be cleared through customs prior to departure in order to convince him to travel on their aircraft.

37. Because Defendant Gorden is Defendant Plane Travel, LLC's Chief Pilot, his statements are directly attributable to Plane Travel, LLC, itself.

## II.   *The Captain Threatens to Take Off Without Clearance*

38. Mr. Whitaker then began to receive conflicting information from the flight crew regarding their customs clearance. The co-pilot intentionally represented to Mr. Whitaker that text messages on his phone were confirmation of clearance from customs. When Mr. Whitaker reviewed these text messages, he immediately recognized that the texts were not clearance from customs and in fact had nothing to do with customs at all. In fact, the flight crew had misrepresented the context of the texts in order to deceive Mr. Whitaker.

39. Defendant Gorden told Mr. Whitaker that, regardless of customs clearance, he intended to make a "command decision" to take off anyway, risking fines, penalties, or worse. Mr. Whitaker strongly warned the captain that taking off without clearing customs would be considered by Mr. Whitaker to be an act of kidnapping. Defendant Gorden took off anyway knowing he was headed to Florida and not New Hampshire.

40. The flight crew repeatedly assured Mr. Whitaker that they had received clearance from customs to depart. Mr. Whitaker relied on their qualifications and experience in giving his agreement that they could depart. The flight crew also claimed that the plane would land in Florida, but only to take on additional fuel, contrary to their assurances that the Flight could proceed direct to its final destination.

41. However, Mr. Whitaker later learned that the plane had <u>not</u> been cleared through customs and instead would be landing at Fort Lauderdale Executive to go through customs – and not merely to take on fuel. Mr. Whitaker was shocked at an ostensibly professional flight crew's deception, poor judgment, and lack of professionalism. At one point, one of the pilots remarked that he thought they were in the United Kingdom and had to be told by a baggage handler that they were in fact on U.S. Virgin Islands soil. At another point, Mr. Whitaker had to loan his phone to one of the pilots to make a call.

42. The flight crew later lied that they could not complete customs in Saint Thomas because the customs office was closed, yet Mr. Whitaker had witnessed the office open with employees working inside while on the ground before departure.

### III.     *The Flight Departs for Florida, Not Direct to New Hampshire as Promised*

43. At or about 4:46 P.M., and without having cleared customs, the Flight departed Saint Thomas Virgin Islands.

44. The original and all flight plans filed by the flight crew, including Defendant Gorden, always indicated a destination of Fort Lauderdale, not New Hampshire. Both pilots knew at all times they would not be flying direct to New Hampshire but actively misled Mr. Whitaker to believe otherwise.

45. On information and belief, N479DR is a model of Beechjet 400A that is not capable of flying direct to New Hampshire from Saint Thomas under normal circumstances, a fact known to the flight crew, including Defendant Gorden, but not known to Mr. Whitaker.

46. At or about 7:31 P.M., the aircraft touched down in Fort Lauderdale. Mr. Whitaker and his entire party were instructed to deplane along with all of their luggage, dogs, and a medical sleeping device valued at $5,000. The group did not have the proper paperwork on hand

9

for the dogs, since Mr. Whitaker had been assured of a pre-cleared, direct flight to New Hampshire. One passenger was playing with Play-Doh to calm anxiety, and the customs officials harassed them as though the Play-Doh was explosive, bomb-making material. Customs officials similarly harassed the entire party and threatened to quarantine the dogs. None of this would have happened had Defendants' statements been accurate, that the party had cleared customs and that the plane was headed directly to New Hampshire.

47.   Mr. Whitaker was put in touch with the customs office chief via telephone. The customs chief informed him that the flight crew had been wrong to depart Saint Thomas without clearance and should have obtained pre-clearance instead. Mr. Whitaker, who had provided all necessary information to clear customs to Defendants in advance, also learned that the Saint Thomas customs office is open until 4:00 P.M., which left enough time to obtain clearance prior to departure, despite Defendants' claims to the contrary.

### IV.   *Plaintiffs Lose a Multi-Million Dollar Contract Due to Defendants' Deception*

48.   Mon Ethos' scheduled meeting with the NBA player's business manager came and went while the Flight was airborne. Mr. Whitaker missed this meeting as a direct result of Defendants' delays, misrepresentations, and negligence, causing a loss to Mon Ethos of at least $2,000,000.

49.   At or about 11:28 P.M., more than two hours after the scheduled time of the meeting, and more than three hours after the time Defendants promised, the aircraft finally landed in New Hampshire. A flight that Defendants claimed would take only four and a half hours instead took more than eight and a half hours. Mon Ethos' staff, who had been arranged to pick up the traveling party, had to wait at the airport for hours, causing Mon Ethos to incur additional wages,

10

and due to the COVID-19 pandemic, the staff members could not find hotel rooms and instead had to drive back home to Boston, arriving well after 1:00 A.M.

50. Mr. Whitaker and his party also discovered that the flight crew had failed to replace the medical sleeping device after removing it from the aircraft in Florida, causing a serious health issue and economic loss to its owner.

### V. *Substandard Condition of the Aircraft*

51. N479DR itself was far below the typical standards of charter aircraft Mr. Whitaker is used to in his business travels.

52. There was no temperature control on the aircraft. Defendants claimed the temperature would decrease after takeoff but instead the cabin only got warmer, especially from a massive heat radiating from the floor. The floor was so hot that all three dogs refused to sit on it. Despite having received standard sedatives before the flight, all three dogs were displaying symptoms of overheating and extreme anxiety.

53. At 9:03 P.M., Mr. Whitaker used an app on his phone to measure ambient air temperature, which measured a reading of 98.2 degrees inside the cabin.

54. There were only three small bottles of water on the aircraft, which were grossly inadequate for three people in 98+ degree heat.

55. Mr. Whitaker's party discovered that one of the seard belts could not be securely latched.

56. Defendants promised that wireless internet would be available upon reaching cruising altitude, but the internet service never worked, preventing Mr. Whitaker from rescheduling his meeting while airborne.

57. In addition, Plaintiffs noticed multiple fit-and-finish issues with the aircraft, including a section behind the lavatory that was completely loose and detached from the wall and could potentially cause injury if thrown into motion by turbulence or a hard landing.

### VI. *Defendants Try to Cover Their Tracks and Refuse Responsibility*

58. After the flight, Defendants attempted to mislead the broker that procured the flight on Plaintiffs' behalf. Defendants falsely informed the broker that the Flight was cleared by customs at 3:41 P.M., authorized by Defendants' dispatch to depart at 4:30 P.M., and just 25 minutes later was advised to divert to Fort Lauderdale for customs clearance.

59. In reality, on information and belief, and at the time known only to Defendants, the flight departed Saint Thomas bound for Fort Lauderdale from the very beginning; it was never "diverted." The claimed timeline also makes no sense: if the plane was actually pre-cleared by customs as claimed at 3:41 P.M., there would be no need to divert for customs clearance in Florida less than a hour later.

60. Plaintiffs attempted to resolve this matter with Defendants prior to commencing a lawsuit. Plaintiffs sent correspondence dated June 10 and requested a response by June 12. Since June 4, Defendants have never responded to Plaintiffs' correspondence regarding the Flight at any time.

### FIRST CAUSE OF ACTION
**Negligent Misrepresentation**

61. Plaintiffs incorporate paragraphs 1 through 60 of this Complaint as though fully set forth herein.

62. Defendants stated that the Flight would be pre-cleared through customs, and that the Flight could proceed to New Hampshire nonstop, arriving at the agreed-upon time of 8:00 to

12

6801253v.1

8:30 P.M.  Defendants also stated that the Flight would arrive in time for a prescheduled business meeting between 9:15 P.M. and 9:30 P.M.

63. These were material facts and the essence of Plaintiffs' reason for traveling.

64. Defendants knew or should have known these statements were false when made.

65. Defendants intended to induce Plaintiffs to rely on their statements to accept the Flight, to allow the Flight to depart, and to pay Defendants for the Flight.

66. Plaintiffs have suffered injury in the form of general damages, lost profits and revenue, unnecessary wages paid to employees, and other damages to be proved at trial. Defendants' actions were outrageous and reckless, justifying an award of punitive and exemplary damages.

## SECOND CAUSE OF ACTION
**Fraud**

67. Plaintiffs incorporate paragraphs 1 through 60 of this Complaint as though fully set forth herein.

68. Defendants stated that the Flight would be pre-cleared through customs, and that the Flight could proceed to New Hampshire nonstop, arriving at the agreed-upon time of 8:00 to 8:30 P.M.  Defendants also stated that the Flight would arrive in time for a prescheduled business meeting between 9:15 P.M. and 9:30 P.M.

69. These were material facts and the essence of Plaintiffs' reason for traveling.

70. Defendants knew these statements were false when made.

71. Defendants intended to induce Plaintiffs to rely on their statements to accept the Flight, to allow the Flight to depart, and to pay Defendants for the Flight.

72. Plaintiffs reasonably relied to their detriment on the statements by Defendants.

73. Plaintiffs have suffered injury in the form of general damages, lost profits and revenue, unnecessary wages paid to employees, and other damages to be proved at trial. Defendants' actions were outrageous and reckless, so as to justify an award of punitive and exemplary damages.

### THIRD CAUSE OF ACTION
### Conversion

74. Plaintiffs incorporate paragraphs 1 through 60 of this Complaint as though fully set forth herein.

75. Plaintiffs possessed a specific, readily ascertainable amount of money paid for the Flight. This amount is known to Plaintiffs and capable of proof.

76. Plaintiffs enjoy the immediate right to possess the money due to Defendants failing to deliver on the Flight they promised in exchange for that money.

77. Plaintiffs demanded return of their money, and Defendants, by ignoring Plaintiffs' demand, have refused to return the money.

78. Plaintiffs are entitled to a return of their money. Additionally, Defendants' actions were outrageous and done knowingly, so as to justify an award of punitive and exemplary damages.

### FOURTH CAUSE OF ACTION
### Breach of Contract

79. Plaintiffs incorporate paragraphs 1 through 60 of this Complaint as though fully set forth herein.

80. A contract existed between Plaintiffs and Defendants to perform a flight direct from Saint Thomas, U.S. Virgin Islands, to New Hampshire, for the disclosed purpose of arriving in time for a business meeting at 9:15 to 9:30 P.M. Defendants agreed and represented repeatedly

that the flight would be direct, pre-cleared through customs, and would arrive between 8:00 P.M. and 8:30 P.M. local time.

81.     Defendants failed to deliver on the contract, as they instead flew Plaintiffs to Florida, and then to New Hampshire, arriving more than three hours later than agreed, failed to pre-clear customs, and further failed to inform Plaintiffs of any anticipated breach.

82.     Plaintiffs did all they were required to do under the contract, or were excused from performing.

83.     As a consequential result, Plaintiffs have lost the moneys paid under the contract, lost an anticipated $2,000,000 contract that was substantially like to have been closed at the business meeting, and incurred additional incidental expenses to be proved at trial that include, but are not limited to, additional wages paid to staff who were required to remain at the airport until its final arrival.

## FIFTH CAUSE OF ACTION
### Breach of the Covenant of Good Faith and Fair Dealing

84.     Plaintiffs incorporate paragraphs 1 through 60 of this Complaint as though fully set forth herein.

85.     Under Florida law, every contract includes an implied covenant of good faith and fair dealing in order to protect the parties' reasonable expectations.  Good faith means honesty in the conduct of contractual relations.  The covenant of good faith and fair dealing is implicated whenever a given question is not answered in the contract terms, or when one party has the power to use its discretion without defined standards.

86.     A contract existed between Plaintiffs and Defendants to perform a flight direct from Saint Thomas, U.S. Virgin Islands, to New Hampshire, for the disclosed purpose of arriving in time for a business meeting at 9:15 to 9:30 P.M.  Defendants agreed and represented repeatedly

that the flight would be direct, pre-cleared through customs, and would arrive between 8:00 P.M. and 8:30 P.M. local time.

87. Plaintiffs did all or substantially all they were required to do under the contract, or they were excused from having to do these things.

88. All conditions required for Defendants' performance had occurred.

89. Defendants' actions as pleaded herein unfairly interfered with Plaintiffs' receipt of the contract's benefits.

90. Defendants' conduct did not comport with Plaintiffs' reasonable contractual expectations.

91. Plaintiffs have been harmed as alleged herein.

## SIXTH CAUSE OF ACTION
### False Imprisonment

92. Plaintiffs incorporate paragraphs 1 through 60 of this Complaint as though fully set forth herein.

93. Plaintiff Mr. Whitaker informed Defendants that he would consider taking off without customs pre-clearance to be an act of kidnapping.

94. Defendants told Mr. Whitaker that the flight had been cleared by customs, which was false.

95. Defendants took off on the Flight with Mr. Whitaker aboard, unlawfully depriving him of his liberty, against his will, without authority.

96. Defendants' acts were unreasonable and unwarranted under the circumstances. Defendants' actions were outrageous and reckless, so as to justify an award of punitive and exemplary damages.

97. Mr. Whitaker is entitled to damages to be proven at trial.

## SEVENTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress

98. Plaintiffs incorporate paragraphs 1 through 60 of this Complaint as though fully set forth herein.

99. Defendants acted intentionally or recklessly, knowing that emotional distress was the likely result, especially after being told that taking off without preclearance through customs and without Plaintiffs' permission would be considered an act of kidnapping.

100. Defendants' conduct was outrageous, beyond the bounds of decency, and is regarded as utterly intolerable in a civilized society.

101. Mr. Whitaker suffered emotional distress.

102. The emotional distress Mr. Whitaker suffered was severe.

103. Plaintiff is entitled to damages to be proven at trial, including punitive damages based on the outrageousness and recklessness of Defendants' conduct.

## EIGHTH CAUSE OF ACTION
### Tortious Interference with Business Relationship

104. Plaintiffs incorporate paragraphs 1 through 60 of this Complaint as though fully set forth herein.

105. A business relationship existed between Plaintiffs and a readily identifiable NBA player and his business manager.

106. Plaintiffs timely informed Defendants of this relationship.

107. Defendants were aware of this relationship.

108. Defendants intentionally, and without justification, interfered with this relationship by, inter alia, falsely representing to Plaintiffs that the Flight would arrive in New Hampshire on time for the meeting between the two parties of the business relationship and repeatedly assuring Plaintiffs that the Flight would be made direct from Saint Thomas to New Hampshire.

109. As a result, Plaintiffs suffered at least $2,000,000 in damages, the precise amount to be proven at trial. Additionally, Defendants' actions were outrageous and reckless, so as to justify an award of punitive and exemplary damages.

### NINTH CAUSE OF ACTION
### Unjust Enrichment

110. Plaintiffs incorporate paragraphs 1 through 60 of this Complaint as though fully set forth herein.

111. Plaintiffs conferred a benefit on Defendants in the form of moneys paid for the performance of the Flight.

112. Defendants voluntarily accepted and retained the benefit.

113. Due to Defendants' conduct in making false representations, failing to perform as promised, and misleading Plaintiffs as to their ability to perform as promised, it would be inequitable for Defendants to retain the benefit without paying its full value back to Plaintiffs.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court grant them the relief requested as follows:

A. An award of damages to compensate Plaintiffs for all non-monetary and compensatory harm, including compensation for lost business, return of all moneys paid for the Flight, emotional distress and suffering, and all other damages proven at trial;

B. An award of punitive damages, in an amount to be determined at trial, sufficient to deter Defendants from engaging in similar and continued illegal and/or wrongful conduct;

C. All other such and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury in this action.

DATED:  June 25, 2020              Respectfully submitted,

                                   CONSTANGY, BROOKS, SMITH &
                                   PROPHETE LLP


                                   By:   /s/Angelique Groza Lyons
                                         ANGELIQUE GROZA LYONS
                                         Florida Bar No.: 118801
                                         GREGG M. MORAN
                                         Florida Bar No.: 1011060
                                         100 N. Tampa St., Suite 3350
                                         Tampa, FL 33602
                                         Phone: (813) 223-7166
                                         Email: alyons@constangy.com
                                         Email: gmoran@constangy.com


                                   BUCHALTER,
                                   A Professional Corporation
                                         TRACY A. WARREN*
                                         ZACHARY L. SPEAR*
                                         JASON E. GOLDSTEIN
                                         655 West Broadway, Suite 1625
                                         San Diego, CA  92101
                                         Telephone: 619.219.5335
                                         Email:  twarren@buchalter.com
                                         Email:  jgoldstein@buchalter.com
                                         Bar No.: 526991


                                         * PRO HAC VICE APPLICATION
                                         FORTHCOMING

                                         *Attorneys for Plaintiffs Mon Ethos Pro
                                         Consulting, LLC, and David Whitaker*

19